IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

WAYNE ALLEN BEAHM,                      )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Civil Action No. 5:21-00547
                                        )
D.L. YOUNG, *et al.*,                   )
                                        )
                    Defendants.         )

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendants' "Motion to Dismiss, or in the Alternative, Motion

for Summary Judgment" (Document No. 48), filed on March 18, 2022. The Court notified Plaintiff

pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a

response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual

material supporting his claims as they are challenged by the Defendants in moving to dismiss.

(Document No. 52.) On April 18, 2022, Plaintiff filed his Response in Opposition. (Document No.

54.) Having examined the record and considered the applicable law, the undersigned has concluded

that Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment"

(Document No. 48) should be granted.

## PROCEDURAL HISTORY

On October 4, 2021, Plaintiff, acting *pro se*[1] and incarcerated at FCI Beckley, filed his

Complaint for alleged violations of his constitutional and civil rights pursuant to Bivens v. Six

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less
stringent standard than if they were prepared by a lawyer, and therefore they are construed
liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

<u>Unknown Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971). (Document No. 2.) In his Complaint, Plaintiff names the following as Defendants: (1) D.L. Young, Warden; (2) P. Boulet, Associate Warden; (3) B. Fain, Medical Administrator; (4) Roger Edwards, Doctor; (5) S. Vest, FNP Medical PA; (6) J. Dotson, Physical Therapist; (7) S. Phipps, UNICOR Manager; (8) M. Gibson, UNICOR Supervisor; (9) R. Brotrell, Safety Manager; and (10) Federal Correctional Institution Beckley. (<u>Id.</u>) Plaintiff alleges that on November 15, 2019, he fell while removing cardboard in his work area at UNICOR, Section 6. (<u>Id.</u>, p. 10.) Plaintiff contends that when he fell, he felt "extreme pain" in his right shoulder. (<u>Id.</u>) Plaintiff, however, states that he finished removing the cardboard and then reported his injury to Mr. Gibson. (<u>Id.</u>) Plaintiff acknowledges that Mr. Gibson asked, "how I was and I told him I wasn't sure but I think I'll be alright." (<u>Id.</u>) Plaintiff explains that that evening his shoulder continued to get worse and Plaintiff "noticed severe bruising upon waking up on the 18th day of November 2019." (<u>Id.</u>) Plaintiff alleges that he went directly to sick call where he showed his arm to the male nurse and submitted his sick call slip. (<u>Id.</u>) Plaintiff acknowledges that he was put on "sick call callout" and he was evaluated on November 27, 2019, by PA Mr. Vest. (<u>Id.</u>, p. 11.) Plaintiff alleges that PA Vest sent Plaintiff to see Physical Therapist J. Dotson. (<u>Id.</u>) Plaintiff claims that Physical Therapist Dotson advised Dr. Roger Edwards that he was "100% sure" that Plaintiff's rotator cuff was torn. (<u>Id.</u>) Plaintiff contends that PA Vest placed Plaintiff on "light duty in Unicor factory" and ordered an x-ray to be conduct at FCI Beckley. (<u>Id.</u>) Plaintiff complains that even though Plaintiff's arm "was black and blue" and Plaintiff "could hardly move [his] arm," Dr. Edwards stated "this was not an emergency." (<u>Id.</u>) Plaintiff alleges that the "MRI truck finally entered FCI Beckley on January 25, 2021." (<u>Id.</u>, p. 12.) Plaintiff acknowledges that he was evaluated by Dr. Whitfield, an

orthopedic surgeon at FCI Beckley. (Id., p. 12.) Plaintiff contends that he was eventually taken to Dr. Gordon Holen's office where Plaintiff informed Dr. Holen that he "wanted [his] shoulder fixed." (Id.) Plaintiff alleges that Dr. Holen performed surgery on April 19, 2021. (Id.) Plaintiff, however, complains that Dr. Holen stated "I cannot repair your shoulder after surgery due to the long length of time." (Id.) Plaintiff contends that Dr. Holen stated that he could have repair Plaintiff's shoulder "when the accident first occurred on 11-15-2019." (Id.) Plaintiff states that he is "devasted over [his] permanent injury." (Id.) Plaintiff requests monetary relief. (Id., p. 5.)

As Exhibits, Plaintiff attaches the following: (1) A copy of Plaintiff's "Request for Administrative Remedy Informal Resolution Form" dated August 23, 2021 (Id., p. 8.); (2) A copy of Plaintiff's "Privacy Act Request/Freedom of Information Act Request" (Id., p. 13.); (3) A copy of Dr. Gordon Holen's "Consolation Report" regarding Plaintiff's surgery on April 19, 2021 (Id., p. 15.); (4) A copy of Plaintiff's MRI report dated January 22, 2021 (Id., pp. 16 - 17.); (5) A copy of Plaintiff's "Injury Report" dated November 4, 2019[2] (Id., pp. 18 - 19.); and (6) A copy of a letter to Plaintiff from the Forbes Law Offices dated September 8, 2021 (Id., p. 21.).

By Order entered on October 19, 2021, the undersigned denied Plaintiff's Application to Proceed Without Prepayment of Fees and Costs and directed Plaintiff to pay the filing and administrative fee totaling $402. (Document No. 8.) On November 29, 2021, Plaintiff paid the filing and administrative fee. (Document No. 12.) By Order entered on December 3, 2021, the undersigned directed the Clerk to issue process upon Defendants. (Document No. 13.) On January

---

[2] Plaintiff disputes that his injury occurred on November 4, 2019. (Document No. 2, p. 11.) Plaintiff contends that his injury occurred on or about November 15, 2019.

26, 2022, Defendant Dotson filed his Motion to Dismiss and Memorandum in Support. (Document Nos. 33 and 34.) Defendant Dotson argued that Plaintiff's claim against him should be dismissed based on the following: (1) "Plaintiff cannot maintain a *Bivens* cause of action against Jukey Dotson as a private contractor" (Document No. 34, pp. 4 – 5); (2) Plaintiff failed to exhaust his administrative remedies (Id., pp. 5 – 9); and (3) "Plaintiff's Complaint must be dismissed for failure to state a claim upon which relief can be granted because he has failed to plead a sufficient factual predicate to establish a claim for deliberate indifference against Jukey Dotson" (Id., pp. 9 – 13). As an Exhibit, Defendant Dotson attached a copy of his Affidavit. (Document No. 33-1.)

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on January 27, 2022, advising him of the right to file a response to Defendant Dotson's Motion to Dismiss. (Document No. 35.) In his Response, Plaintiff stated that he "may have been overzealous in naming Jukey Dotson as a defendant in this matter and would not object to Mr. Dotson being dismissed as a party in this civil action." (Document No. 43, p. 1.) Plaintiff, however, stated that he does dispute that he did not exhaust his administrative remedies. (Id., pp. 1 – 7.) As Exhibits, Plaintiff attached the following: (1) A copy of a "Consultation Report" dated June 15, 2021 (Id., p. 11); (2) A copy of Plaintiff's "Injury – Lost – Time Follow-Up – Part 2" dated November 4, 2019 and April 24, 2020 (Id., p. 12); and (3) A copy of Plaintiff's Affidavit regarding the exhaustion of administrative remedies (Document No. 44).

In Reply, Defendant Dotson noted that Plaintiff states that he has no objection to the dismissal of Defendant Dotson. (Document No. 45.) Accordingly, Defendant Dotson requested that this Court grant his Motion to Dismiss and order the dismissal of Defendant Dotson from the above action. (Id.)

4

By Proposed Findings and Recommendation entered on February 23, 2022, the undersigned recommended that the District Court granted Defendant Dotson's Motion to Dismiss (Document No. 33) and refer the matter back to the undersigned for further proceedings as to the remaining Defendants. (Document No. 46.)

On March 18, 2022, Defendants Young, Boulet, Fain, Edwards, Vest, Phipps, Gibson, Brotrell, and FCI Beckley ("Defendants") filed their "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 48 and 51.) Defendants argue that Plaintiff's claim should be dismissed based on the following: (1) "Defendant Fain is a U.S. Public Health Service Employee entitled to immunity (Document No. 51, p. 18 – 19.); (2) There is a lack of personal involvement by Defendants Gibson, Phipps, and Brotrell (Id., pp. 19 – 20.); (3) "Demko precludes Plaintiff's recovery under Bivens for the work-related injury itself and for any negligent medical treatment" (Id., pp. 20 – 22.); (4) Plaintiff's fails to establish deliberate indifference to support his constitutional claim (Id., pp. 22 – 29.); and (5) Defendants are entitled to qualified immunity (Id., pp. 29 – 30.)

As Exhibits, Defendants attach the following: (1) The Declaration of Destiny Spearen (Document No. 48-1, pp. 2 – 10.); (2) A copy of Plaintiff's Injury Report (Id., p. 5.); (3) The Declaration of Roger Edwards, D.O. (Document No. 48-2.); (4) A copy of Plaintiff's medical records (Id., pp. 6 – 365.); and (5) A copy of a printout of WebMD (Id., pp. 367 – 376.)

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on March 21, 2022, advising him of the right to file a response to Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgement." (Document No. 52.) On April 18, 2022, Plaintiff filed his Response in Opposition to Defendants' "Motion to Dismiss, or in the

Alternative, Motion for Summary Judgment." (Document No. 54.) As Exhibits, Plaintiff attached the following: (1) A copy of his Injury Report (Id., pp. 19 – 21.), and (2) A copy of pertinent medical records (Id., pp. 23 – 25.). By Order entered on April 26, 2022, United States District Judge Frank W. Volk adopted the undersigned's recommendation and granted Defendant Dotson's Motion to Dismiss. (Document No. 55.) On October 31, 2022, Plaintiff filed a copy of his Inmate Accident Compensation Claim and Independent Medical Examination. (Document No. 59-1.)

## SUMMARY OF MEDICAL RECORD

In November 2019, Plaintiff was injured while working in UNICOR at FCI Beckley when he fell while removing cardboard in his work area. (Document No. 2) Plaintiff states that when he fell, he felt "extreme pain" in his right shoulder. (Id.) Plaintiff, however, asserts that he finished removing the cardboard and then reported his injury to Defendant Gibson. (Id.) Plaintiff acknowledges that Mr. Gibson asked, "how I was and I told him I wasn't sure but I think I'll be alright." (Id.) Plaintiff explains that that evening his shoulder continued to get worse and several days later Plaintiff "noticed severe bruising upon waking up." (Id.) Plaintiff alleges that he went directly to sick call where he showed his arm to the male nurse and submitted his sick call slip. (Id.)

Plaintiff's medical records reveal that Plaintiff reported to sick call on November 14, 2019, and he was evaluated by Defendant Vest. (Document No. 48-2, pp. 69 – 70.) Plaintiff informed Defendant Vest that he fell approximately ten days ago at work and hit his right shoulder. (Id.) Plaintiff states he was standing on a dolly when he slipped and fell. (Id.) Defendant Vest noted that Plaintiff reported the pain and bruising were slowly improving. (Id.) Plaintiff complained of mild pain when raising his arm above his head. (Id.) Defendant Vest examined Plaintiff noting

bruising to Plaintiff's upper right arm, but good range of motion. (Id.) Defendant Vest ordered an x-ray of Plaintiff's shoulder and directed Plaintiff to return to sick call if his condition worsened or did not improve. (Id.) Plaintiff's x-ray was performed on November 19, 2019, revealing no fracture or malalignment with mild osteoarthritic changes of the acromioclavicular joint. (Id., pp. 95 – 96.) On January 19, 2020, Plaintiff was evaluated by Defendant Vest for a follow-up visit. (Id., pp. 62 – 67.) Plaintiff reported continued right shoulder pain, but noted some improvement. (Id.) Defendant Vest examined Plaintiff noting that Plaintiff continued to maintain a good range of motion. (Id.) Defendant Vest reviewed the x-ray results with Plaintiff, prescribed a seven-day course of prednisone, advised Plaintiff to continue Ibuprofen, and submitted a consult request for physical therapy. (Id.) Plaintiff was instructed to return to sick call if his condition worsened or did not improve. (Id.)

On February 13, 2020, Plaintiff was evaluated by Physical Therapist Dotson, a contract physical therapist. (Id., pp. 59 – 60.) Plaintiff complained that he could not raise his arm and had pain with weakness. (Id.) Physical Therapist Dotson examined Plaintiff's arm noting tenderness and decreased range of motion. (Id.) Physical Therapist Dotson's assessment was right rotator cuff tear with limited range of motion and strength. (Id.) Therapeutic exercises were conducted including active assisted range of motion of the right shoulder for flexion, abduction, side external rotation, and abduction, and table slides. (Id.) Plaintiff was education on performing the exercises. (Id.) On February 20, 2020, Plaintiff had a physical therapy session with Dotson. (Id., Document No. 57 – 58.) Plaintiff reported that he could move his right shoulder better and Dotson noted increased shoulder movement. (Id.) Therapeutic exercises were conducted including manual shoulder range of motion in all directions for tightness and limited range, supine shoulder flexion

assisted, side external rotation and side shoulder abduction, and standing active range of motion shoulder flexion exercises. (Id.) Plaintiff was again educated on performing the exercises. (Id.) On February 27, 2020, Plaintiff again had a physical therapy session with Dotson. (Id., pp. 55 – 56.) Plaintiff noted improvement with motion, but complained he was unable to lift with his right arm. (Id.) Therapeutic exercises were conducted including exercises for range of motion of the right shoulder in all directions with overpressure, supine active assisted shoulder flexion, side shoulder abduction, side external rotation, and wall climbing exercises. (Id.)

On February 28, 2020, Plaintiff was evaluated by Defendant Edwards during a Chronic Care visit. (Id., Document No. 51 – 54.) Defendant Edwards evaluated Plaintiff concerning his diabetes, hypertension, and other chronic ailments. (Id.) It was noted that Plaintiff was taking NSAIDS for his shoulder pain with reasonable relief. (Id.) On March 17, 2020, Plaintiff had a physical therapy session with Dotson. (Id., pp. 49 – 50.) Plaintiff stated that he was able to do more with his shoulder and felt therapy was helping. (Id.) Therapeutic exercises were conducted including therex for range of motion in all directions and weakness, supine shoulder flexion, side abduction, and side external rotation. (Id.) Dotson noted that Plaintiff was "doing better with shoulder motion but is still very weak." (Id.) On March 19, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 47.) Plaintiff continued to report that therapy was helping, but complained of weakness. (Id.) Therapeutic exercises were conducted including manual stretching of the right shoulder for range of motion, supine shoulder flexion, side shoulder external rotation, supine serratus punches, and manual resistance exercise for external rotation. (Id.) By Administrative Note also entered on March 19, 2020, Defendant Edwards indicated that he had submitted a consultation request for Plaintiff's evaluation by Dr. Whitfield, a community

8

orthopedist. (Id., p. 46.) Defendant Edwards noted that Plaintiff was undergoing physical therapy for his right shoulder pain and weakness, but was still very weak. (Id.) Defendant Edwards noted that Plaintiff's x-ray results were unremarkable for acute injury, but he indicated his concerns of a rotator cuff injury. (Id.)

On March 24, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 44.) Plaintiff informed Dotson that he wanted to see Dr. Whitfield for evaluation of his shoulder. (Id.) On exam, Dotson noted tenderness and decreased range of active motion. (Id.) Therapeutic exercises were conducted including therex for range of motion, light below shoulder level strengthening for shoulder isometrics to include external rotation, internal rotation and abduction sub maximal. (Id.) On March 26, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 42.) Plaintiff noted the lack of soreness after doing the strengthening exercise at the last session. (Id.) Therapeutic exercises were conducted including therex for range of motion, light below shoulder level strengthening for shoulder isometrics to include external rotation, internal rotation, abduction, active range of motion for supine shoulder flexion, and side external rotation. (Id.) Dotson noted that standing shoulder flexion and abduction was still very limited and weak. (Id.)

On March 27, 2020, Plaintiff was evaluated at the prison by Dr. Whitfield, an outside orthopedic surgeon. (Id., pp. 90 – 93.) Plaintiff advised Dr. Whitfield that physical therapy had helped his range of motion, but he continued to have pain and weakness. (Id.) After examining Plaintiff, Dr. Whitfield noted a suspected right shoulder rotator cuff tear and impingement syndrome in the right shoulder. (Id.) Dr. Whitefield explained as follows (Id.):

> I discussed with the patient it appears as though he has a mechanism as well as clinical exam that is significant for weakness and pain, which could represent rotator cuff tear. He has regained his range of motion which is consistent with the contralateral side except for a mild diminution of his internal rotation. I would like

9

to obtain an MRI in order to evaluate a rotator cuff tear as I feel that he does have weakness which is indicative of a rotator cuff tear as well as an injury which could be a positive mechanism for a rotator cuff tear. I will see him back after the MRI, at which time we will likely need to have a discussion on arthroscopic rotator cuff repair as long as the tear is amendable to being fixed. He is to continue working on strengthening as well as range of motion exercises so he does not lose any more motion. I will see him back after the MRI.

On March 31, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 40.) Plaintiff complained that he did not like waiting for physical therapy and would prefer to work on his therapy in his housing unit. (Id.) Therapeutic exercises were conducted and Plaintiff was instructed to continue his exercises until the MRI was conducted. (Id.) Plaintiff was discharged from physical therapy. (Id.) On April 7, 2020, Health Services received a fax from Dr. Whitfield's office containing his summary of the examination and the recommendation for an MRI. (Id., pp. 90 – 91.) By Administrative Note entered the same day, Defendant Vest indicated that Dr. Whitfield recommended an MRI of Plaintiff's right shoulder. (Id., p. 39.) Defendant Vest also submitted a consult request for an MRI with the priority noted as routine and the level of care noted as medically necessary, non-emergent. (Id., pp. 348 – 350.) The target date for the MRI was July 6, 2020. (Id.) On April 13, 2020, the Clinical Director at FCI Beckley approved the MRI referral. (Id., p. 350.) On April 16, 2020, Regional approval was granted for the MRI referral. (Id.)

On June 24, 2020, Plaintiff reported to sick-call requesting surgery on his shoulder. (Id., p. 38.) Defendant Vest explained to Plaintiff that the MRI had been ordered and approved, but the MRI would be conducted after the COVID-19 lockdown was lifted.[3] (Id.) On July 21, 2020,

---

[3] In his Declaration, Defendant Edwards explains that a traveling MRI bus periodically comes to FCI Beckley to perform MRIs, but the bus is scheduled to come only when there are 7 or more inmates scheduled for a study. Defendant Edwards further states that during the above time, the institution was locked down for COVID and the bus service was halted due to COVID restrictions. Finally, Defendant Edwards explains that if this would have been an emergent or time sensitive

Plaintiff was evaluated by Defendant Vest during a Chronic Care visit. (Id., pp. 31 – 35.) Plaintiff reported that he was taking NSAIDs for his shoulder pain with only minimal relief. (Id.) Defendant Vest noted that Plaintiff had been approved for an MRI but due to COVID, no outside consultations were permitted. (Id.) Defendant Vest further noted that once the MRI was performed, Plaintiff would have a follow-up appointment with Dr. Whitfield. (Id.) Defendant Vest renewed Plaintiff's prescription for Ibuprofen 800 mg for pain. (Id.) By Administrative Note entered on August 31, 2020, Defendant Vest indicated an adjustment to Plaintiff's medications due to an elevated blood pressure reading. (Id., pp. 21 – 28.) On September 17, 2020, Plaintiff was seen in Health Service for reported chest pain. (Id., pp. 17 – 20.) Plaintiff stated he took Zantac, which did decrease the pain. (Id.) Plaintiff denied any radiation of pain, shortness of breath, nausea, or vomiting. (Id.) Plaintiff was evaluated, an EKG was completed, and the EKG results showed no acute injury. (Id.) Plaintiff was instructed to return to Health Services as needed or if his condition worsened. (Id.) On September 30, 2020, Plaintiff had an optometry exam in Health Service due to his diabetes. (Id., pp. 10 – 15.) On October 6, 2020, Plaintiff had a follow-up with Defendant Vest regarding his hypertension and diabetes. (Id., pp. 7 - 9.) Defendant Vest examined Plaintiff and adjusted his medications. (Id.) By Administrative Note entered on October 27, 2020, Defendant Vest noted review of Plaintiff's blood pressure flow sheet. (Id., p. 6.) On November 10, 2020, Plaintiff was again evaluated by Defendant Vest concerning his hypertension and diabetes. (Id., pp. 199 – 200.) On December 2, 2020, Plaintiff's underwent a preventative health screening. (Id., pp. 195 – 198.) On December 18, 2020, Plaintiff was evaluated by Defendant Edwards during a Chronic Care

---

situation, other arrangements for an MRI would have been made but Plaintiff's study was not considered time sensitive. (Document No. 48-2, pp. 2 – 3.)

visit. (Id., pp. 190 – 194.) Plaintiff reported his continued use of NSAIDs for pain with reasonable

relief. (Id.) Defendant Edwards noted Plaintiff was awaiting an MRI, which had been delayed due

to COVID-19 concerns. (Id.)

On January 22, 2021, Plaintiff's MRI was conducted. (Id., pp. 307 – 308.) The MRI report

was completed on January 25, 2021, revealing the following:

> A complete tear of the supraspinatus tendon with proximal retraction of the
> myotendinous junction and superior migration of the humeral head within the
> glenoid fossa. Prominent spurring was noted at the acromioclavicular joint
> consistent with the clinical diagnosis of impingement syndrome. The long head of
> the biceps tendon showed displaced medially outside of the bicipital groove
> appearing in the anterior portion of the glenohumeral joint.

(Id., p. 307.) On January 28, 2021, Health Services received a copy of the MRI report and it was

reviewed by Defendant Edwards. (Id., p. 309.) By Administrative Note entered on February 17,

2021, Defendant Vest indicated that the MRI had been completed and summarized the MRI report

in Plaintiff's medical record. (Id., p. 189.) It was further noted that Dr. Holen,[4] an orthopedic

surgeon, would be consulted for surgical evaluation. (Id.) On the same day, Defendant Vest

completed a consultation request with a target date of April 18, 2021. (Id., pp. 351 – 352.) The

priority was noted as routine and the level of care was medically necessary, non-emergent. (Id.)

On February 17, 2021, Defendant Edwards approved the consultation request. (Id., p. 353.) On

March 16, 2021, Defendant Vest entered a medication reconciliation encounter concerning

Plaintiff's diabetes medication. (Id., p. 188.)

On April 6, 2021, Plaintiff was evaluated by Dr. Holen. (Id., pp. 298 – 304.) Dr. Holen

---

[4] At this time, Dr. Whitfield had resigned as the orthopedic consultant for FCI Beckley and
arrangements were made for Dr. Holen to see FCI Beckley's orthopedic patients. (Document No.
48-2, p. 3.)

performed x-rays of Plaintiff's right shoulder, which reveals mild osteoarthritic change of the acromioclavicular joint. (Id., p. 302.) Dr. Holen also reviewed Plaintiff's MRI report. (Id., p. 300.) Dr. Holen noted the following treatment plan:

> I discussed the clinical radiographic findings with Wayne. I discussed the natural history and course of these conditions as well as continued conservative and procedural options. My initial thought that was possibility of performing arthroscopy with decompression and rotator cuff repair with further look at the MRI and his history my concern is an irreparable rotator cuff with degenerative arthritis and acetabular station of the humeral head on the acromion. My next thought would be consideration of a reverse total shoulder arthroplasty. He was in agreement to go wherever direction we felt most suitable. Risks complications alternative benefits were discussed at length with him including but not limited to anesthesia complications possibly including death, DVT, pulmonary embolism, neurovascular damage, malunion, nonunion, hardware failure, or dislocation, incomplete relief of pain fracture, and need for additional subsequent surgical intervention and wished to proceed with surgical treatment despite these potential devastating and life threatening complications. All his questions were answered, informed consent was obtained, no guarantees given regarding surgical outcome.

On April 7, 2021, Health Services received a copy of Dr. Holen's above report and Plaintiff was evaluated by Defendant Vest. (Id., pp. 303, 354 – 356.) Defendant Vest noted that Dr. Holen recommended surgery. (Id.) Defendant Vest completed a consultation request the same day with a target date of April 28, 2021. (Id.) It was noted that the priority was routine and the level of care was medically necessary, non-emergent. (Id.) On the same day, April 7, 2021, Defendant Edwards approved the consultation request. (Id.) The Regional review was conducted and the consultation was approved on April 12, 2021. (Id.) By Administrative Note entered on April 13, 2021, Defendant Vest noted that Plaintiff needed pre-operative labs and clearance. (Id., p. 181.) On April 14, 2021, Defendant Vest evaluated Plaintiff and cleared him for surgery. (Id., pp. 178 – 179.)

On April 19, 2021, Dr. Holen discussed with Plaintiff the reverse shoulder arthroplasty and documented that Plaintiff declined the procedure. (Id., pp. 284 – 289.) Dr. Holen noted that he

explained to Plaintiff the large possibility that this was a chronic retracted rotator cuff tear that would be irreparable, and that it limited the overall benefit that could be obtained surgically. (Id., pp. 287 – 288.) Dr. Holen noted that he discussed and offered a reverse shoulder arthroplasty with Plaintiff, but Plaintiff declined. (Id.) Dr. Holen then noted that Plaintiff underwent a right shoulder decompression and no rotator cuff repair was performed. (Id.) Plaintiff returned to the prison with treatment orders and instructions to perform rotator cuff stretches and strengthening exercises for six weeks. (Id., p. 285.) It was noted that Plaintiff had no weight bearing restrictions. (Id.)

On April 27, 2021, Defendant Vest submitted a consult request for a post-surgical examination with Dr. Holen. (Id., pp. 357 – 359.) It was noted to be routine and medically necessary, non-emergent with a target date was May 13, 2021. (Id.) On April 29, 2021, Defendant Edward approved the consultation request. (Id.) On April 30, 2021, Plaintiff had his sutures removed in Health Services. (Id., p. 172.) It was noted that the wound appeared healed and Plaintiff had no complaints. (Id.) Plaintiff was instructed to wear the sling until the follow-up appointment. (Id.) On May 4, 2021, Defendant Vest submitted a consult request for physical therapy. (Id., p. 358 – 365.) The consult request noted that Plaintiff had surgery on his right shoulder and that Dr. Holen recommended a total shoulder replacement but Plaintiff refused. (Id.) The priority was noted a routine with the level of care being medically necessary, non-emergent with a target date of May 18, 2021. (Id.) On May 4, 2021, Defendant Edwards approved the consult request for physical therapy. (Id.)

On May 11, 2021, Plaintiff was evaluated by Dotson. (Id., pp. 168 – 169.) Plaintiff complained of some aching of the right shoulder, bruising, and trouble sleeping. (Id.) Plaintiff advised that he had been wearing the sling and moving his arm. (Id.) Physical therapy was

performed including "passive range of motion of the right shoulder in a pain free range to prevent adhesions and tightness of the shoulder to include shoulder flexion, abduction, and external rotation, pendulum for relaxation and joint mobility and table slides for passive stretching." (<u>Id.</u>) On May 13, 2021, Dr. Holen saw Plaintiff for his post-operative appointment. (<u>Id.</u>, p. 281.) Dr. Holen noted his concern about the repairability of the rotator cuff and his offering preoperatively of a reverse total shoulder arthroplasty, which Plaintiff refused. (<u>Id.</u>) Dr. Holen advised Plaintiff of the intraoperative findings and his expectation that Plaintiff would get some relief with the procedure. (<u>Id.</u>) Dr. Holen, however, informed Plaintiff that he will always have pain related to the irreparable rotator cuff tear and arthritis. (<u>Id.</u>) Dr. Holen again explained that a "definitive fixation would be a reverse should arthroplasty," but Plaintiff stated he was "very content having not undergone this procedure." (<u>Id.</u>) Plaintiff was provided with information on range of motion strengthening exercises. (<u>Id.</u>) Plaintiff advised that he was taking ibuprofen and his pain was controlled. (<u>Id.</u>) Also on May 13, 2021, Plaintiff had a physical therapy session with Dotson. (<u>Id.</u>, pp. 166 167.) Therapeutic exercises were conducted including passive range of motion of the right shoulder in a pain free range to prevent adhesions and tightness of the shoulder to include shoulder flexion, abduction and external rotation, pendulum for relaxation and join mobility and table slides for passive stretching, and supine active range of motion with opposite arm for support. (<u>Id.</u>) On May 25, 2021, Plaintiff had a physical therapy session with Dotson. (<u>Id.</u>, p. 161.) Therapeutic exercises were conducted including active range of motion of the right shoulder in a pain free range to prevent adhesions and tightness of the shoulder to include shoulder flexion, abduction and external rotation, supine shoulder flexion, side external rotation, shoulder pulley and table slides. (<u>Id.</u>) On May 27, 2021, Plaintiff failed to show for his physical therapy appointment. (<u>Id.</u>, p. 160.)

On June 1, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 158.) Therapeutic exercises were conduct including manual stretching of the shoulder for limited range of motion, active range of motion for shoulder flexion, abduction, external rotation, internal rotation, shoulder pulleys, wall climbs, internal rotation stretching, rotator cuff strengthening with theraband to include external rotation and scapular stabilization with scapular retractions. (Id.) Plaintiff complained of some popping of the shoulder with movements. (Id.) Also on June 1, 2021, Plaintiff was evaluated by Defendant Vest at a Chronic Care visit. (Id., pp. 153 - 156.) It was noted that Plaintiff had shoulder surgery, was taking physical therapy, and reported no issues. (Id.) It was further noted that Plaintiff refused to have a complete shoulder replacement. (Id.) On June 3, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 149.) Plaintiff complained of continued weakness of the shoulder. (Id.) Therapeutic exercises were conducted for manual stretching of the right shoulder, range of motion exercises with shoulder pulley, internal rotation stretching, rotator cuff strengthening with theraband for internal and external rotation, shoulder blade retractions and shoulder flexion. (Id.) On June 8, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 147.) Plaintiff complained that his shoulder was very sore following the last session. (Id.) Therapeutic exercises were conducted for manual stretching in all direction, active range of motion exercises, range of motion exercises with shoulder pulley, wall climbs, and shoulder circles. (Id.) On June 10, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 145.) Plaintiff reported to "not being as stiff as before." (Id.) Therapeutic exercises were conducted for range of motion and warm up with manual stretching in all directions, supine shoulder flexion, side shoulder abduction, side external rotation, shoulder pulley, shoulder internal rotation with pulley, shoulder blade retractions with X-cords, standing internal and external

rotation with x-cords for strengthening. (Id.)

On June 15, 2021, Plaintiff was seen by Dr. Holen for a follow up appointment. (Id., pp. 141 – 143, 278.) Plaintiff reported he was "doing reasonably well." (Id., p. 278.) Dr. Holen examined Plaintiff noting weakness and limited mobility, but noted that Plaintiff was "incredibly active and functional with that arm despite these underlying issues." (Id.) Dr. Holen again explained that definitive treatment would be a reverse total shoulder arthroplasty, but Plaintiff was "most interested in trying to continue to stay as active and heathy as possible." (Id.) Dr. Holen noted that given the fact that Plaintiff was "incredibly functional, we both agree that we would hold off on any surgery at this time unless his pain was to significantly increase and worsen." (Id.) Plaintiff was instructed to continued physical therapy, but any follow up would be on an as need basis. (Id.) On June 22, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 147.) Plaintiff complained that "rain makes his shoulder ache a bit more." (Id.) Therapeutic exercises were conducted for manual stretching in all directions, supine shoulder flexion, side shoulder abduction, sider external rotation, shoulder pulley, shoulder internal rotation with pulley, shoulder blade retractions with x-cords, standing internal and external rotation with x-cords for strengthening. (Id.) On June 24, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 137.) Plaintiff was provided with a blue theraband to work on the strengthening of his right shoulder. (Id.) Manual therapy for shoulder mobilization and therapeutic exercises were conducted. (Id.)

On July 8, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 134.) Plaintiff complained that "lifting out to the sides is still tender and weak." (Id.) Therapeutic exercises were conducted for manual stretching in all direction, active range of motion exercises for shoulder

flexion, abduction, external and internal rotation followed by scapular stabilization with scapular retractions, and shoulder extension. (Id.) By Administrative Note entered on July 13, 2021, Plaintiff requested to see Dr. Holen "due to inaccuracies in his report." (Id., p. 133.) Defendant Vest noted that he would send an email to see if Dr. Holen would like to discuss the foregoing with Plaintiff. (Id.) Also on July 13, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 131.) Therapeutic exercises were conducted for manual stretching of the right shoulder, shoulder pulley, internal rotation stretching, side abduction, side external rotation, scapular strengthening with x-cords range of motion exercises, and shoulder extensions. (Id.) Plaintiff reported when he lifted his right elbow to the side and over that such caused more shoulder pain. (Id.) On July 15, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 129.) Plaintiff reported "some catching of the shoulder while reaching out to the side, but doing better than before." (Id.) Therapeutic exercises were conducted for manual stretching of the right shoulder, range of motion exercises with shoulder pulley, internal rotation stretching, rotator cuff strengthening with theraband for internal and external rotation, shoulder blade retractions and shoulder flexion. (Id.)

On August 17, 2021, Plaintiff was examined by Defendant Vest. (Id., pp. 127 - 128.) Plaintiff requested an adjustment to his pain medication. (Id.) It was noted that Plaintiff was prescribed Carbamazepine twice a day and Ibuprofen. (Id.) Plaintiff explained he was taking the Carbamazepine only once daily. (Id.) Defendant Vest instructed Plaintiff to take the Carbamazepine twice daily and prescribed acetaminophen 325 twice a day. (Id.) On August 19, 2021, Plaintiff had a physical therapy session with Dotson. (Id., pp. 124 - 125.) Plaintiff reported he had been doing his exercises on lockdown. (Id.) Therapeutic exercises were conducted for range

of motion of the right shoulder and warm up with manual stretching in all directions, supine shoulder flexion, side shoulder abduction, side external rotation, shoulder internal rotation with pulley, therapeutic activities for shoulder blade retractions with x-cords, standing internal and external rotation with x-cords for strengthening, shoulder flexion and shoulder abduction with x-cords, serratus punches and pulling for functional strengthening. (Id.) By Administrative Note entered on August 23, 2021, it was noted that Dr. Holen requested to see Plaintiff for a follow-up appointment due to his complaints of significant pain. (Id., p. 123.) On the same day, Defendant Vest submitted a consult request with a target date of September 14, 2021. (Id., pp. 360 – 362.) The priority was noted as routine and the level of care listed was medically necessary, non-emergent. (Id.) On August 24, 2021, Defendant Edwards approved the consult request. (Id.)

On September 14, 2021, Dr. Holen saw Plaintiff for a follow-up evaluation. (Id., p. 275.) Dr. Holen documented he had offered and encouraged a reverse total shoulder arthroplasty, but it was more surgery than Plaintiff wanted to undergo at that time. (Id.) It was noted that Plaintiff report little relief from the surgery and his pain was essentially the same. (Id.) Specifically, Dr. Holen noted the following:

> I explained the clinical and radiographic findings with him. Unfortunately, he has not seemed to obtain much relief with the decompression and Mumford acromioplasty. I explained that, as we had potentially expected, the rotator cuff was irreparable. That is likely the persistent source of his pain. Definitive treatment would be a reverse total shoulder arthroplasty. I did again offer this to him, but he states that he is going to be getting out relatively soon and would prefer to get it done on the street.

(Id.) Dr. Holen further indicated that Plaintiff "mentioned a few errors in the initial evaluation with regard to his history." (Id.) Dr. Holen states that at the time of is dictation, he was unable to obtain copies of those but he would request them and make the appropriate corrections. (Id.) On

September 21, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 119.) Plaintiff stated that he felt he could work on the exercises on his own. (Id.) Plaintiff reported some weakness, but understands that is how it will be. (Id.) Plaintiff was released from physical therapy at that time. (Id.)

By Administrative Note entered on October 6, 2021, Plaintiff reported Ibuprofen was no longer helping and requested Vicoprofen. (Id., p. 116.) Plaintiff was advised that Vicoprofen would not be prescribed because it was a narcotic. (Id.) Plaintiff, however, was agreeable to another NSAID and was prescribed Naproxen 500 mg tablets. (Id.) On October 16, 2021, Plaintiff was taken to an outside hospital for leg cramps and dehydration. (Id., pp. 112 – 114.) On October 18, 2021, Plaintiff was provided follow-up care by prison staff. (Id., pp. 104 - 109.) On October 29, 2021, Plaintiff was seen by PA Cooper for leg cramps and dehydration. (Id., pp. 98 – 100.) Plaintiff also complained of continued right shoulder pain. (Id.) Plaintiff informed PA Cooper he was told the last surgery was unsuccessful and he would need a shoulder replacement. (Id.) Plaintiff complained that Naproxen did little to help with his pain, and he had tried Elavil before but did not tolerate it well. (Id.) Plaintiff was prescribed Duloxetine and told to follow up at sick call as need or if no improvement. (Id.) On November 4, 2021, Defendant Edwards evaluated Plaintiff at a Chronic Care visit. (Id., pp. 318 – 322.) Plaintiff complained of pain in his right shoulder, left knee, and back. (Id.) Plaintiff stated he was taking NSAIDs for pain, which was provide reasonable relief. (Id.) Plaintiff further advised that he was doing his physical therapy. (Id.) Plaintiff noted that the "bands" made his shoulder hurt worse, but he was doing the stretching and range of motion exercises. (Id.) Plaintiff's prescriptions for Naproxen and Acetaminophen were continued. (Id.) On December 2, 2021, Plaintiff was seen for a preventative care visit. (Id.,

pp. 314 – 316.) On December 3, 2021, Plaintiff was evaluated for his knee pain and provided an articular injection. (Id., pp. 311 – 313.)

## **THE STANDARD**

### **Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

### **Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's

claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

1.  **Improper Party:**

A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may

be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under <u>Bivens</u> must show the violation of a valid constitutional right by a person acting under color of federal law. However, <u>Bivens</u> claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); <u>Berger v. Pierce</u>, 933 F.2d 393, 397 (6th Cir. 1991); <u>Reingold v. Evers</u>, 187 F.3d 348, 355 n. 7 (4th Cir. 1999). In his Complaint, Plaintiff names FCI Beckley as a Defendant. As stated above, the foregoing is an improper party. The undersigned, therefore, respectfully recommends that Plaintiff's Complaint be dismissed as to FCI Beckley.

## 2.    **Defendant Fain:**

In Defendants' Motion, Defendant Fain argues that he is a United States Public Health Service Employees and is entitled to absolute immunity. (Document No. 48 and Document No. 51, pp. 18 - 19.) In support, Defendants attach the Declaration of Destiny Spearen, a Paralegal employed by the BOP's Beckley, West Virginia Consolidate Legal Center. (Document No. 48-1, pp. 2 – 3.) Ms. Spearen states BOP records indicate that "Health Services Administrator B. Fain is a Commissioned Officer with the Public Health Service." (<u>Id.</u>) In his Response in Opposition, Plaintiff fails to specifically address the above argument. (Document No. 54.)

Title 42 U.S.C. § 233(a) provides as follows:

The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 . . . for damages for personal injury, including death, resulting from the performance of medical, surgical, dental or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same

subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

Thus, Congress made proceedings under the Federal Tort Claims Act the sole avenue to seek relief against a Public Health Service employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment. The United States Supreme Court has held that "[t]he immunity provided by § 233(a) precludes *Bivens* actions against individual [Public Health Service] officers or employees for harms arising out of constitutional violations committed while acting within the scope of their office or employment." Hui v. Castaneda, 559 U.S. 799, 130 S.Ct. 1845, 1847, 176 L.Ed.2d 703 (2010)(stating that Section 233(a) "plainly precludes a *Bivens* action against petitioners by limiting recovery for harms arising from the conduct at issue to an FTCA action against the United States.") Defendant Fain holds the position of the Health Services Administrator ["HSA"] at FCI Beckley. Thus, Plaintiff appears to allege that Defendant Fain is responsible for failing to ensure that he was provided appropriate medical care. Defendant Fain was clearly acting within the scope of his employment when performing functions pertinent to his position, such as his administrative oversight and supervision of the Health Services Department. Based on the foregoing, the Court finds that Defendant Fain was a Commissioned Officer in the United States Public Health Service during the time period relevant to this Complaint and has absolute immunity from suit for all claims arising from the medical care provided to Plaintiff. The Court, therefore, respectfully recommends that Defendant Fain's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" be granted. The undersigned finds it unnecessary to consider the other reasons which Defendant Fain has submitted for dismissal of Plaintiff's claims.

3.    **Claims against Defendants Young, Boulet, Gibson, Phipps, and Brotrell:**

24

Plaintiff names the following supervisory officials: (1) Warden Young; (2) Former Associate Warden Boulet; (3) Work Supervisor Gibson; and (4) UNICOR Operations Manager Phipps, and (5) Safety Administrator Brotrell. Plaintiff appears to contend that Defendants Young, Boulet, Gibson, Phipps, and Brotrell violated his constitutional rights by failing to ensure that Plaintiff received proper medical treatment. (Document No. 2.) Plaintiff's Complaint, however, fails to set forth *any* allegations against Defendants Young and Boulet. (Id.) As to Defendants Gibson, Phipps, and Brotrell, Plaintiff's factual allegations merely reveal that these Defendants completed paperwork relating to Plaintiff's injury. (Id.) Plaintiff's Complaint fails to allege any facts supporting a claim that Defendants Gibson, Phipps, and Brotrell committed any specific acts or omission that violated his constitutional rights.

In Defendants' Motion, Defendants Young and Boulet contend that Plaintiff's claims against them are improperly raised based upon supervisory liability. (Document No. 48 and Document No. 51, pp. 19 – 20.) Specifically, Defendants Young and Boulet argue that Plaintiff "provides no information or evidence to substantiate his claim that these supervisory defendants committed any specific acts or omission that violated his constitutional rights." (Id.) Defendants Gibson, Phipps, and Brotrell argue they are named as Defendants "based on their completion of paperwork related to the injury itself and are supervisory employees who have no involvement in the medical care provided to Plaintiff." (Id.) Therefore, Defendants Young, Boulet, Gibson, Phipps, and Brotrell argue that Plaintiff has not established the requisite personal involvement necessary to support Bivens liability and they are entitled to dismissal from this action. (Id.)

In Response, Plaintiff explains that he is not a lawyer and he included the above Defendants out of an abundance of caution. (Document No. 54, pp. 2 – 7.) Plaintiff states that he believes his Injury Report wasn't prepared until March or April of 2020, after he had a conversation with

Defendant Brotrell. (Id.) Plaintiff states that he went to Defendant Brotrell's office on March 24, 2020, inquiring whether Defendant Brotrell had received Plaintiff's Injury Report concerning Plaintiff's fall in UNICOR on November 15, 2019. (Id.) Plaintiff contends that Defendant Brotrell conducted a search and determined he did not have the Injury Report, but he would contact Plaintiff's supervisor (Defendant Gibson). (Id.) Plaintiff states that on April 21, 2020, Defendants Phipps and Brotrell came to his cell to get a signature and date on the Injury Report. (Id.) Plaintiff, however, complains that Defendant Phipps and Brotrell directed him to predate the Injury Report to November 4, 2019. (Id.) Plaintiff notes that his injury occurred on November 15, 2019 instead of November 4, 2019, and that he found the request to predate the form to be "suspicious and improper."[5] (Id.) Plaintiff explains that he believed the forgoing facts to be possibly relevant and he "thought I'd best start from the very beginning and include everyone and everything in my statement of claim when filing my suit." (Id.) Plaintiff clarified that he included the above Defendants because he was concerned if he "was supposed to include them and didn't, [he] wouldn't be able to add them later." (Id.) Plaintiff, however, acknowledges that the above Defendants "didn't take part directly in my medical treatment for which my claim is truly about."

---

[5] Although Federal regulations require that the work supervisor complete and forward a BP-140 injury report to the Institutional Safety Manager at the time of the injury (28 C.F.R. § 301.105(a)), the lack of such a BP-140 injury report does not preclude Plaintiff from obtaining relief under the IACA. *Johnson v. Stanley*, 2018 WL 1830731, * 5 (S.D. Ga. April 17, 2018)(finding that the BP-140 report is *not* a prerequisite for redress under the IACA). As stated below, Section 301.303(a) provides that an inmate must submit an FPI Form 43 Inmate Claim to the Institutional Safety Manager 45 days prior to his/her release in order to obtain accident compensation. 28 C.F.R. § 301.303(a). The Federal regulations further provide that a claimant may present evidence and witnesses in support of his/her claim, the Committee "shall consider all evidence presented by the claimant," and compensation determinations are made on "all available evidence." 28 C.F.R. §§ 301.305, 301.309, and 301.310. Thus, an award of compensation under the IACA is not contingent on the filing of a BP-140 injury report. To the extent Plaintiff is claiming that his work supervisor's failure to complete a BP-140 injury report on the date of his injury was improper or would preclude Plaintiff from obtaining compensation under the IACA for his work-related physical impairment, Plaintiff is incorrect.

(Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 129 S.Ct. at 1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Also see Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendants Young, Boulet, Gibson, Phipps, and Brotrell argue that Plaintiff has failed to demonstrate specifically how they were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendants Young, Boulet, Gibson, Phipps, and Brotrell violated his constitutional rights with respect to their failure to supervise employees. The evidence of record, however, does not indicate any personal involvement by Defendants Young and Boulet. Further, the only allegations against Defendants Gibson, Phipps, and Brotrell

27

involve their completion of paperwork regarding Plaintiff's Injury Report. In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4ᵗʰ Cir. 1990). In the instant case, it is undisputed that there is no evidence that Young, Boulet, Gibson, Phipps, and Brotrell were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct. Accordingly, Plaintiff has improperly raised his claim against Young, Boulet, Gibson, Phipps, and Brotrell under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The Court therefore finds that Young, Boulet, Gibson, Phipps, and Brotrell's "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" should be granted. The undersigned finds it unnecessary to consider the other reasons which the Young, Boulet, Gibson, Phipps, and Brotrell have submitted for dismissal.

**4.    IACA precludes recovery under Bivens for work-related injury and any negligent medical treatment:**

In their Motion, Defendants argue that Plaintiff's request for damages should be dismissed concerning his work-related injury and for any negligent medical treatment concerning such. (Document No. 48 and Document No. 51, pp. 20 – 22.) Defendants note that as relief, Plaintiff requests 2 million dollars as compensation for his medical expenses and his pain and suffering caused by the injury. (Document No. 51, pp. 20 – 22.) Defendants explain that "[t]o the extent Plaintiff seeks damages for the injury itself or any negligent care provided for the work-related injury, his exclusive remedy is through the IACA." (Id.) Defendants argue that Plaintiff can only

28

recover under the IACA for injuries he sustained while performing his job duties at FCI Beckley and there is no dispute that Plaintiff's injury was work-related. (Id.)

In his Response, Plaintiff fails to specifically address the above issue. (Document No. 54.) Plaintiff, however, clarifies that he is alleging that Defendants were "deliberately indifferent to this injury and the pain I have been suffering due to it." (Id., p. 16.)

The Inmate Accident Compensation Act provides an accident compensation procedure "for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined." 18 U.S.C. § 4126(c)(4). Federal prisoners, however, cannot recover under the FTCA for work-related injuries as the Prison Industries Fund, 18 U.S.C. § 4126, provides the exclusive remedy for injuries incurred in work-related incidents. See United States v. Demko, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966). Recovery is barred under the FTCA for the work-related injury itself and for the negligent treatment of that injury. Vander v. U.S. Dept. of Justice, 268 F.3d 661 (9th Cir. 2001); also see Cooleen v. Lamanna, 248 Fed. Appx. 357, 362 (3rd Cir. 2007)(finding that a claim brought in connection with subsequent negligence of prisoner doctors, rather than the initial work-related injury, is barred by Section 4126); Wooten v. United States, 825 F.2d 1039, 1044 (6th Cir. 1987)("Section 4126 is also the exclusive remedy when a work-related injury is subsequently aggravated by negligence and malpractice on the part of prison officials."); Thompson v. United States, 495 F.2d 192, 193 (5th Cir. 1974)("Despite the appellant's allegation that the negligence of the hospital worker occasioned further injuries, for which he seeks damages, he is barred from litigating the matter under the [FTCA] since the cause of his original injury was work-related and compensable under 18 U.S.C. § 4126."); Cook v. United States, 2012 WL 5383395 (D.S.C. Nov. 1, 2012), aff'd.,530 Fed.Appx 217 (4th Cir. 2013), cert. denied, 571 U.S. 1209, 134 S.Ct. 1292,

188 L.Ed.2d 319 (2014)("The Inmate Accident Compensation Act is also the exclusive remedy for negligent treatment of federal prisoners' work-related injuries."). A "work-related injury" is "defined to include any injury including occupational disease or illness proximately caused by the actual performance of the inmate's work assignment." 28 C.F.R. § 301.102(a). "Work location" is defined by the BOP as "any place that inmate is authorized to be performing his assignment." BOP Program State 1600.09. "The cause of the injury is irrelevant so long as the injury itself occurred while the prisoner was on the job." Aston v. United States, 625 F.2d 1210, 1211 (5th Cir. 1980)(per curiam). Section 4126 not only covers injuries incurred while working in the prison, but includes pre-existing medical conditions that are subsequently injured or exacerbated in work-related incidents. See Vander, supra, 268 F.3d at 664; Wooten v. United States, 825 F.2d 1039 (6th Cir. 1987); Aston, 625 F.2d at 1211. Section 301.301(c), however, provides that "compensation shall not be paid for injuries suffered away from the work location (e.g., while the claimant is going to or leaving work, or going to or coming from lunch outside of the work station or area)." 28 C.F.R. § 301.301(c).

Courts have broadly construed the term "work-related" injury. In Baynes v. United States, 302 Fed.Appx. 334 (6th Cir. 2008), the Sixth Circuit determined that an injury occurring during a trip to or from a job site, while on-the-clock, was a work-related injury. Baynes, 302 Fed.Appx. at 335-36; also see Payton v. United States, 2011 WL 3240487 (E.D.N.C. July 28, 2011)(although the injury occurred while plaintiff was traveling to lunch, the court concluded the injury was work-related because the injury occurred while plaintiff was still on-the-clock and being paid.) In Wooten v. United States, 437 F.2d 79 (5th Cir. 1971), the Fifth Circuit determined that an inmate suffered a work-related injury where the inmate was injured on the work site while traveling to

lunch. <u>Wooten</u>, 437 F.2d at 80(finding inmate suffered a work-related injury while traveling on an elevator on his way to lunch). Courts are generally unwilling to determine that an inmate's injury is work-related absent evidence that the injury occurred during work activities, on the work site, or while the inmate was "on-the-clock." <u>See</u> <u>Goforth v. United States</u>, 2010 WL 3835541 (S.D.W.Va. Sep. 29, 2010)(denying summary judgment where there was "some evidence in the record to support [Plaintiff's] contention" that she was going to her job site at the time of her accident."); <u>Codianni-Robles v. United States</u>, 2005 WL 2098837, * 2 (D.Conn. Aug. 29, 2005)(the District Court denied the government's motion to dismiss finding inadequate evidence that plaintiff's injuries were work-related because "she had finished her work assignment earlier in the day" and a "different inmate was assigned to work at the time of her accident.").

Based upon a review of the record, the undersigned finds that Plaintiff's injury occurred while he was on the job and the injury was work-related. Plaintiff acknowledges that he was injured while working in UNICOR at FCI Beckley on or about November 15, 2019. (Document No. 2.) Plaintiff states that he was injured when he fell while removing cardboard in his work area at UNICOR, Section 6. (<u>Id.</u>) Defendants further concede that Plaintiff's injury occurred on the job and was work-related. Accordingly, the undersigned finds that recovery for damages for the work-related injury, or any negligent care provided for work-related injury, is not available as the IACA provides the exclusive remedy for injuries incurring in work-related incidents.[6] Thus, the

---

[6] The BOP's Inmate Locator indicates that Plaintiff is currently located at Baltimore RRM and his projected release date is June 8, 2023. By letter filed with the Court on May 2, 2022, Plaintiff indicated that he had filed a claim under the IACA. (Document No. 56.) Title 28 C.F.R. § 301.301(a) provides that "[n]o compensation for work-related injuries resulting in physical impairment shall be paid *prior to an inmate's release*." 28 C.F.R. § 301.301(a)(emphasis added). Subsection (b) provides that "[c]ompensation may only be paid for work-related injuries or claims alleging improper medical treatment of a work-related injury." 28 C.F.R. § 301.301(b). Title 28

undersigned recommends that the District Court grant the Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 48) as to his damage request for the work-related injury itself and for any negligent medical treatment for such injury.

**5.        No Eighth Amendment Violation by Defendants Edwards and Vest.**

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore

---

C.F.R. § 301.303 provides the time parameters for filing a claim. Subsection (a) provides as follows:

> No more than 45 days prior to the date of an inmate's release, but no less than 15 days prior to this date, each inmate who feels that a residual physical impairment exists as a result of an industrial, institution, or other work related injury shall submit a FPI Form 43, Inmate Claim for Compensation on Account of Work Injury. Assistance will be given the inmate to properly prepare the claim, if the inmate wishes to file. In each case a definite statement shall be made by the claimant as to the impairment caused by the alleged injury. The completed claim form shall be submitted to the Institution Safety Manager or Community Corrections Manager for processing.

28 C.F.R. § 301.303(b).

constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless

disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

Miltier, 896 F.2d at 851-52(*recognized in* Sharpe v. South Carolina Dept. of Corr., 621 Fed.Appx. 732, 733 (4th Cir. 2015) *as overruled in part on other grounds by* Farmer, 511 U.S. at 837, 114 S.Ct. 1970); see also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must

therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

In his Complaint, Plaintiff contends that Defendants Edwards and Vest acted with deliberate indifference in violation of the Eighth Amendment by failing to provide Plaintiff with appropriate medical care following his fall in November 2019. (Document No. 2, pp. 11 - 12.) Plaintiff alleges that despite Physical Therapist Dotson informing Defendant Edwards that he was "100% sure" that Plaintiff's rotator cuff was torn, Defendant Edwards continued to treat Plaintiff's injury as non-emergent. (Id.) Plaintiff complains that he had to wait until January 25, 2021, for an MRI to be conducted. (Id.) Although Plaintiff acknowledges that he underwent surgery on April 19, 2021, Plaintiff complains that his shoulder could not be repaired due to the "long length of time." (Id.) Plaintiff alleges that Dr. Holen told him that his shoulder could have been repaired when the accident first occurred in November 15, 2019. (Id.) Plaintiff, therefore, argues that he has suffered permanent injury to his shoulder due to the delay of the MRI. (Id.)

In their Motion, Defendants argue that Plaintiff cannot establish an Eighth Amendment medical claim of deliberate indifference against Defendants Edwards and Vest. (Document No. 48 and Document No. 51, pp. 22 - 29.) Although Defendants Edwards and Vest acknowledge that a torn rotator cuff is a serious condition, Defendants argue that Plaintiff cannot satisfy either the objective or subjective components. (Id.) Specifically, Defendants claim that Plaintiff cannot show he was not timely or properly treated by Defendants Edwards and Vest. (Id.) Defendants contend that Plaintiff was provided with timely and proper medical treatment. (Id.) Finally, Defendants assert there is no evidence that Defendants intentionally withheld or delayed medical treatment or intentionally interfered with Plaintiff's prescribed treatment to inflict pain. (Id.)

In Response, Plaintiff argues that Defendants Edwards and Vest acted with deliberate

35

indifference by failing to treat his shoulder injury as an emergency and ordering an MRI in a timely manner. (Document No. 54.) Specifically, Plaintiff claims that an MRI should have been ordered by Defendants Edwards and Vest after the x-ray showed no breaks because Defendants were aware of Plaintiff's limited mobility. (Id.) Plaintiff further argues that Defendants Edwards and Vest erred by directing Plaintiff to participate in physical therapy prior to having MRI results. (Id.) Plaintiff argues that physical therapy did not help his shoulder in any way, but only caused him more pain. (Id.) Plaintiff disputes that he ever reported to medical staff that physical therapy was helping his shoulder. (Id.) Plaintiff states that he discontinued physical therapy because it was painful and the believed it was making his shoulder worse. (Id.) Plaintiff speculates that if Defendants Edwards and Vest would have ordered an MRI immediately after his x-ray, the MRI results would have revealed the torn rotor cuff prior to any COVID-19 restrictions or delays, and Plaintiff's shoulder could have been surgically repaired. (Id.)

For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Plaintiff alleges that his torn rotator cuff caused pain and suffering. Additionally, Defendants concede that a torn rotator cuff is a serious medical condition. Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's medical need was serious enough to give rise to an Eighth Amendment claim.

Next, the undersigned will consider whether the Defendants Edwards and Vest acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege Defendants Edwards and Vest's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. A review of Plaintiff's

medical records reveals that a few days after Plaintiff's injury, he reported to sick call complaining of pain and bruising to his right shoulder. (Document No. 48-2, pp. 69 – 70.) Defendant Vest examined Plaintiff noting bruising to Plaintiff's upper right arm, but good range of motion. (Id.) Defendant Vest ordered an x-ray of Plaintiff's shoulder and directed Plaintiff to return to sick call if his condition worsened or did not improve. (Id.) Approximately five days later, on November 19, 20219, an x-ray was performed revealing no fracture or malalignment with mild osteoarthritic changes of the acromioclavicular joint. (Id., pp. 95 – 96.) On January 19, 2020, Plaintiff was evaluated by Defendant Vest for a follow-up visit and Plaintiff reported continued right shoulder pain. (Id., pp. 62 – 67.) Defendant Vest examined Plaintiff noting that Plaintiff continued to maintain a good range of motion. (Id.) Defendant Vest reviewed the x-ray results with Plaintiff, prescribed a seven-day course of prednisone, advised Plaintiff to continue Ibuprofen, and submitted a consult request for physical therapy. (Id.) On February 13, 2020, Plaintiff was evaluated by Physical Therapist Dotson. (Id., pp. 59 – 60.) Plaintiff complained that he could not raise his arm and had pain with weakness. (Id.) Physical Therapist Dotson examined Plaintiff's arm noting tenderness and decreased range of motion. (Id.) Physical Therapist Dotson's assessment was right rotator cuff tear with limited range of motion and strength. (Id.) Therapeutic exercises were conducted and Plaintiff was educated on performing the exercises. (Id.) On February 20, 2020, Plaintiff had a physical therapy session with Dotson and Dotson noted increased shoulder movement. (Id., pp. 57 – 58.) On February 27, 2020, Plaintiff again had a physical therapy session with Dotson. (Id., pp. 55 – 56.) Dotson noted limited shoulder motion and weakness. (Id.) One day later, on February 28, 2020, Plaintiff was evaluated by Defendant Edwards during a Chronic Care visit. (Id., pp. 51 – 54.) It was noted that Plaintiff was taking NSAIDS for his shoulder pain with reasonable relief. (Id.) On March 17, 2020, Plaintiff had a

physical therapy session with Dotson. (Id., pp. 49 – 50.) Dotson noted that Plaintiff was doing better with his shoulder motion, but was still very weak. (Id.) On March 19, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 47.) Dotson noted Plaintiff's external rotation and abduction of the shoulder was very weak. (Id.) By Administrate Note also entered on March 19, 2020, Defendant Edwards indicated that he had submitted a consultation request for Plaintiff's evaluation by an "outside" orthopedist. (Id., p. 46.) Defendant Edwards noted that Plaintiff was undergoing physical therapy for his right shoulder pain and weakness, but was still very weak. (Id.) Defendant Edwards noted concerns of a rotator cuff injury. (Id.)

On March 24, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 44.) Dotson noted tenderness and decreased range of active motion. (Id.) On March 26, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 42.) Dotson noted that standing shoulder flexion and abduction was still very limited and weak. (Id.) Three days later, on March 27, 2020, Plaintiff was evaluated at the prison by Dr. Whitfield, an outside orthopedic surgeon. (Id., pp. 90 – 93.) After examining Plaintiff, Dr. Whitfield noted a suspected right shoulder rotator cuff tear and impingement syndrome in the right shoulder. (Id.) Dr. Whitfield noted Plaintiff had "regained his range of motion which is consistent with the contralateral side except for a mild diminution of his internal rotation." (Id.) Dr. Whitfield recommended an MRI and to see Plaintiff "back after the MRI, at which time we will likely need to have a discussion on arthroscopic rotator cuff repair as long as the tear is amendable to being fixed." (Id.) Dr. Whitfield instructed Plaintiff to "continue working on strengthening as well as range of motion exercises so he does not lose any more motion." (Id.) On March 31, 2020, Plaintiff had a physical therapy session with Dotson. (Id., p. 40.) Plaintiff complained that he did not like waiting for physical therapy and would prefer to work on his therapy in his housing unit. (Id.) Plaintiff was discharged from physical therapy, but was

38

instructed to continue his exercises until the MRI was conducted. (<u>Id.</u>) On April 7, 2020, Health Services received a fax from Dr. Whitfield's office containing his summary of the examination and the recommendation for an MRI. (<u>Id.</u>, pp. 90 – 91.) By Administrative Note entered the same day, Defendant Vest indicated that Dr. Whitfield recommended an MRI of Plaintiff's right shoulder and submitted a consult request for an MRI with the priority noted as routine and the level of care noted as medically necessary, non-emergent. (<u>Id.</u>, pp. 39, 348 – 350.) The target date for the MRI was July 6, 2020. (<u>Id.</u>) On April 13, 2020, the Clinical Director at FCI Beckley approved the MRI referral. (<u>Id.</u>, p. 350.) On April 16, 2020, Regional approval was granted for the MRI referral. (<u>Id.</u>)

On June 24, 2020, Plaintiff reported to sick-call requesting surgery on his shoulder. (<u>Id.</u>, p. 38.) Defendant Vest explained to Plaintiff that the MRI had been ordered and approved, but the MRI would be conducted after the COVID-19 lockdown was lifted. (<u>Id.</u>) On July 21, 2020, Plaintiff was evaluated by Defendant Vest during a Chronic Care visit. (<u>Id.</u>, pp. 31 – 35.) Plaintiff reported that he was taking NSAIDs for his shoulder pain with only minimal relief. (<u>Id.</u>) Defendant Vest noted that Plaintiff had been approved for an MRI but due to COVID, no outside consultations were permitted. (<u>Id.</u>) Defendant Vest further noted that once the MRI was performed, Plaintiff would have a follow-up appointment with Dr. Whitfield. (<u>Id.</u>) Defendant Vest renewed Plaintiff's prescription for Ibuprofen 800 mg for pain. (<u>Id.</u>) Between August 31, 2020, and December 2, 2020, Plaintiff was evaluated and treated for medical problems unrelated to his right shoulder injury. (<u>Id.</u>, pp. 6 – 28, 195 – 200.) On December 18, 2020, Plaintiff was evaluated by Defendant Edwards during a Chronic Care visit and Plaintiff reported his continued use of NSAIDs for pain with reasonable relief. (<u>Id.</u>, pp. 190 – 194.) Defendant Edwards noted Plaintiff was awaiting an MRI, which had been delayed due to COVID-19 concerns. (<u>Id.</u>) On January 22, 2021, Plaintiff's MRI

was conducted. (Id., pp. 307 – 308.) The MRI report was completed on January 25, 2021, revealing "[a] complete tear of the supraspinatus tendon with proximal retraction of the myotendinous junction and superior migration of the humeral head within the glenoid fossa" and "[p]rominent spurring was noted at the acromioclavicular joint consistent with the clinical diagnosis of impingement syndrome." (Id., p. 307.) On January 28, 2021, Health Services received a copy of the MRI report and it was reviewed by Defendant Edwards. (Id., p. 309.) By Administrative Note entered on February 17, 2021, Defendant Vest indicated that the MRI had been completed and that an orthopedic surgeon (Dr. Holen)[7] would be consulted for surgical evaluation. (Id., p. 189.) On the same day, Defendant Vest completed a consultation request with a target date of April 18, 2021, priority was noted as routine, and level of care was medically necessary, non-emergent. (Id., pp. 351 – 352.) Defendant Edwards also approved the consultation request on the same day. (Id., p. 353.) Approximately three weeks later, on April 6, 2021, Plaintiff was evaluated by Dr. Holen. (Id., pp. 298 – 304.) Dr. Holen performed x-rays of Plaintiff's right shoulder, which revealed mild osteoarthritic change of the acromioclavicular joint. (Id., p. 302.) Dr. Holen also reviewed Plaintiff's MRI report. (Id., p. 300.) Dr. Holen explained the first option of performing an arthroscopy with decompression and rotator cuff repair, but noted his concern of "an irreparable rotator cuff with degenerative arthritis and acetabular station of the humeral head on the acromion." (Id.) Second, Dr. Holen explained the option of a reverse total shoulder arthroplasty. (Id.) Dr. Holen noted that Plaintiff was "in agreement to go wherever direction we felt most suitable." (Id.) On April 7, 2021, Health Services received a copy of Dr. Holen's above report,

---

[7] As stated above, Whitfield had resigned as the orthopedic consultant for FCI Beckley and arrangements were made for Dr. Holen to see FCI Beckley's orthopedic patients. (Document No. 48-2, p. 3.)

Plaintiff was evaluated by Defendant Vest, and Defendant Vest completed a consultation request for the surgery. (Id., pp. 303, 354 – 356.) It was noted that the priority was routine and the level of care was medically necessary, non-emergent. (Id.) Defendant Edwards approved the consultation request on the same day, and the Regional office approved the request on April 12, 2021. (Id.) By Administrative Note entered on April 13, 2021, Defendant Vest noted that Plaintiff needed pre-operative labs and clearance. (Id., p. 181.) On April 14, 2021, Defendant Vest evaluated Plaintiff and cleared him for surgery. (Id., pp. 178 – 179.)

Approximately five days later, on April 19, 2021, Dr. Holen performed Plaintiff's surgery. (Id., pp. 284 – 289.) Dr. Holen noted that he explained to Plaintiff the large possibility that this was a chronic retracted rotator cuff tear that would be irreparable, and that it limited the overall benefit that could be obtained surgically. (Id., pp. 287 – 288.) Dr. Holen noted that he discussed and offered a reverse shoulder arthroplasty with Plaintiff as a definitive fixation, but Plaintiff declined. (Id.) Dr. Holen then noted that Plaintiff underwent a right shoulder decompression, but no rotator cuff repair was performed. (Id.) Plaintiff returned to the prison with treatment orders, instructions to perform rotator cuff stretches and strengthening exercises for six weeks, and no restrictions as to weight bearing. (Id., p. 285.) On April 27, 2021, Defendant Vest submitted a consult request for a post-surgical examination with Dr. Holen. (Id., pp. 357 – 359.) On April 29, 2021, Defendant Edward approved the consultation request. (Id.) On April 30, 2021, Plaintiff had his sutures removed in Health Services. (Id., p. 172.) It was noted that the wound appeared healed, Plaintiff had no complaints, and Plaintiff was instructed to wear the sling until the follow-up appointment. (Id.) On May 4, 2021, Defendant Vest submitted a consult request for physical therapy. (Id., p. 358 – 365.) The consult request noted that Plaintiff had surgery on his right shoulder and that Dr. Holen recommended a total shoulder replacement but Plaintiff refused. (Id.)

On the same day, Defendant Edwards approved the consult request for physical therapy. (Id.) On May 11, 2021, Plaintiff was evaluated by Dotson and physical therapy was performed. (Id., pp. 168 – 169.) Plaintiff complained of some aching of the right shoulder, bruising, and trouble sleeping. (Id.)

On May 13, 2021, Dr. Holen saw Plaintiff for his post-operative appointment. (Id., p. 281.) Dr. Holen noted his concern about the repairability of the rotator cuff and his offering preoperatively of a reverse total shoulder arthroplasty, which Plaintiff refused. (Id.) Dr. Holen advised Plaintiff of the intraoperative findings and his expectation that Plaintiff would get some relief with the procedure. (Id.) Dr. Holen, however, informed Plaintiff that he will always have pain related to the irreparable rotator cuff tear and arthritis. (Id.) Dr. Holen again explained that a "definitive fixation would be a reverse should arthroplasty," but Plaintiff stated he was "very content having not undergone this procedure." (Id.) Plaintiff was provided with information on range of motion strengthening exercises. (Id.) Plaintiff advised that he was taking ibuprofen and his pain was controlled. (Id.) Also on May 13, 2021, Plaintiff had a physical therapy session with Dotson. (Id., pp. 166 167.) Plaintiff had a physical therapy session with Dotson on May 25, 2021, but was a no show for therapy on May 27, 2021. (Id., pp. 160 - 161.)

On June 1, 2021, Plaintiff had a physical therapy session with Dotson. (Id., p. 158.) Plaintiff complained of some popping of the shoulder with movements. (Id.) Also on June 1, 2021, Plaintiff was evaluated by Defendant Vest at a Chronic Care visit. (Id., pp. 153 - 156.) It was noted that Plaintiff had shoulder surgery, was taking physical therapy, and reported no issues. (Id.) On June 3, 2021, Plaintiff had a physical therapy session with Dotson and complained of continued weakness of the shoulder. (Id., p. 149.) On June 8, 2021, Plaintiff had a physical therapy session with Dotson and complained that his shoulder was very sore following the last session. (Id., p.

147.) On June 10, 2021, Plaintiff had a physical therapy session with Dotson and reported to "not being as stiff as before." (Id., p. 145.) On June 15, 2021, Plaintiff was seen by Dr. Holen for a follow up appointment and Plaintiff reported he was "doing reasonably well." (Id., pp. 141 – 143, 278.) Dr. Holen examined Plaintiff noting weakness and limited mobility, but noted that Plaintiff was "incredibly active and functional with that arm despite these underlying issues." (Id.) Dr. Holen again explained that definitive treatment would be a reverse total shoulder arthroplasty, but Plaintiff was "most interested in trying to continue to stay as active and heathy as possible." (Id.) Dr. Holen noted that given the fact that Plaintiff was "incredibly functional, we both agree that we would hold off on any surgery at this time unless his pain was to significantly increase and worsen." (Id.) Plaintiff was instructed to continued physical therapy, but any follow up would be on an as need basis. (Id.) On June 22 and 24, 2021, Plaintiff had a physical therapy session with Dotson. (Id., pp. 137 and 147.) On July 8, 2021, Plaintiff had a physical therapy session with Dotson and complained that "lifting out to the sides is still tender and weak." (Id., p. 134.) By Administrative Note entered on July 13, 2021, Plaintiff requested to see Dr. Holen "due to inaccuracies in his report." (Id., p. 133.) Defendant Vest noted that he would send an email to see if Dr. Holen would like to discuss the foregoing with Plaintiff. (Id.) Also on July 13, 2021 and July 15, 2021, Plaintiff had a physical therapy session with Dotson. (Id., pp. 129 and 131.)

On August 17, 2021, Plaintiff was examined by Defendant Vest and he requested an adjustment to his pain medication. (Id., pp. 127 - 128.) It was noted that Plaintiff was prescribed Carbamazepine twice a day, but Plaintiff was only taking it once a day. (Id.) Defendant Vest instructed Plaintiff to take the Carbamazepine twice daily and prescribed acetaminophen 325 twice a day. (Id.) On August 19, 2021, Plaintiff had a physical therapy session with Dotson and Plaintiff reported he had been doing his exercises on lockdown. (Id., pp. 124 - 125.) By Administrative

Note entered on August 23, 2021, it was noted that Dr. Holen requested to see Plaintiff for a follow-up appointment due to Plaintiff's complaints of significant pain. (Id., p. 123.) Defendant Vest submitted a consult request the same day, and Defendant Edwards approved the consult request the following day on August 24, 2021. (Id., pp. 360 – 362.) On September 14, 2021, Dr. Holen saw Plaintiff for a follow-up evaluation. (Id., p. 275.) Dr. Holen documented he had offered and encouraged a reverse total shoulder arthroplasty, but it was more surgery than Plaintiff wanted to undergo at that time. (Id.) It was noted that Plaintiff reported little relief from the surgery and his pain was essentially the same. (Id.) Dr. Holen again noted that "[d]efinitive treatment would be a reverse total shoulder arthroplasty," but Plaintiff again declined the surgery stating "he is going to be getting out relatively soon and would prefer to get it done on the street." (Id.) Dr. Holen further indicated that Plaintiff "mentioned a few errors in the initial evaluation with regard to his history." (Id.) Dr. Holen stated that at the time of his dictation, he was unable to obtain copies of those records to verify, but he would request them and make the appropriate corrections. (Id.) On September 21, 2021, Plaintiff had a physical therapy session with Dotson and stated that he felt he could work on the exercises on his own. (Id., p. 119.) Plaintiff was released from physical therapy at that time. (Id.) By Administrative Note entered on October 6, 2021, Plaintiff reported Ibuprofen was no longer helping and requested Vicoprofen. (Id., p. 116.) Plaintiff was advised that Vicoprofen would not be prescribed because it was a narcotic. (Id.) Plaintiff, however, was agreeable to another NSAID and was prescribed Naproxen 500 mg tablets. (Id.) On October 29, 2021, Plaintiff was seen by PA Cooper and complained of continued right shoulder pain. (Id., pp. 98 – 100.) Plaintiff was prescribed Duloxetine and told to follow up at sick call as need or if no improvement. (Id.) On November 4, 2021, Defendant Edwards evaluated Plaintiff at a Chronic Care visit. (Id., pp. 318 – 322.) Plaintiff complained of pain in his right shoulder, left knee, and

44

back. (Id.) Plaintiff stated he was taking NSAIDs for pain, which was providing reasonable relief. (Id.) Plaintiff further advised that he was doing his physical therapy. (Id.) Plaintiff's prescriptions for pain medication were continued. (Id.)

Based upon the foregoing, Plaintiff cannot satisfy the subjective component. The foregoing does not exhibit that Defendants Edwards and Vest knew of and disregarded Plaintiff's need for testing or treatment concerning his shoulder injury. Plaintiff asserts that Defendants Edwards and Vest acted with deliberate indifference by failing to immediately order an MRI after his x-ray results failed to reveal the cause of his pain and weakness. Plaintiff concludes that this delay in testing delayed his diagnosis of having a torn rotator cuff causing his injury to be irreparable. Plaintiff asserts that Dr. Holen informed him that his shoulder could not be surgically repaired due to the length of time since the injury. Plaintiff further argues that he never advised any medical provider that his injury was improving in any way, but Defendants Edwards and Vest proceeded with treatment plan of physical therapy and conservative treatment. The undersigned first finds that Plaintiff's above bare assertions without producing a scintilla of evidence is insufficient to create a genuine dispute of material fact. See Silling v. Erwin, 881 F.Supp. 236, 237 (S.D.W.Va. 1995)(a party must offer more than bare allegations or conclusory statements to survive a motion for summary judgment). Besides Plaintiff's bare assertions, the record is void of any indication that a delay in testing or treatment resulted in Plaintiff's rotator cuff injury being irreparable. The record reveals there was an approximate eight month delay between the ordering of Plaintiff's MRI, and the MRI actually being performed.[8] This delay, however, was due to COVID restrictions

---

[8] At most, Defendants Edwards and Vest may have been negligent in failing to ensure a speedier performance of Plaintiff's MRI. It is well recognized, however, that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008); also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir.

and the classification of the MRI being non-emergent. In his Declaration, Defendant Edwards states that Plaintiff's need for an MRI was not time sensitive and Plaintiff's medical records do not support his claim that Dr. Holen informed Plaintiff that his shoulder could not be repaired due to the length of time since the injury. (Document No. 48-2, p. 3.) Defendant Edwards explains that "[o]nly 1 of the 4 muscles was torn, and, with the degree of debility and physical examination, conservative treatment was warranted." (Id.) Defendant Edwards further states that "[h]ad the surgery been performed immediately following the injury, there would be no change in the result of the surgery." (Id.) Furthermore, the record reveals that Dr. Holen offered to perform a total shoulder replacement as a definition fixation of Plaintiff's injury, but Plaintiff refused this procedure on at least three occasions.

Even assuming Dr. Holen advised Plaintiff that delay result in his injury being irreparable by means of an arthroscopic procedure, the undersigned finds that Plaintiff cannot establish a claim of deliberate indifference. Specifically, Plaintiff has not established that Defendants Edwards or Vest knew of, and disregarded, Plaintiff's need for emergent testing or treatment. The record clearly reveals that Defendants Edwards and Vest evaluated Plaintiff and provided treatment following each sick-call request and chronic care visit. Although Plaintiff faults Defendants Edwards and Vest for proceeding with physical therapy prior to having MRI results, the record clearly reveals that the outside orthopedist (Dr. Whitfield) agreed with the treatment plan. The record reveals that even though the outside orthopedist strongly suspected a rotator cuff tear and ordered an MRI to confirm, the outside orthopedist instructed Plaintiff to continued with physical therapy. Once the outside orthopedist (Dr. Holen) recommended surgery, the record reveals that

---

1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

Defendants Edwards and Vest acted promptly in obtaining approval for the surgery and Plaintiff's surgery was performed by the outside orthopedist approximately two weeks later. As part of Plaintiff's post-operative discharge instructions, the outside orthopedist directed Plaintiff to continue rotator cuff stretches and strengthening exercises for six weeks. Therefore, there is no indication that Defendants Edwards and Vest's ordering of physical therapy as treatment was improper or caused harm to Plaintiff. Additionally, there is no indication that Defendants Edwards or Vest knew of, and disregarded, Plaintiff's need for more emergent testing or treatment. Although Plaintiff may have preferred skipping physical therapy and having more prompt testing or surgical treatment, this does not establish deliberate indifference. An inmate's disagreement with his medical care or the course of treatment for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation."); also see Wyatt v. Sundaram, 2017 WL 4517820, * 5 – 6 (E.D. Cal. Oct. 10, 2017)(finding that a torn rotator cuff is not a medical emergency and conservative treatment is usually recommended as preliminary treatment); Johnson v. Proctor, 2016 WL 165020, at * 6 – 7 (N.D.W.Va. Jan. 14, 2016)(finding that inmate's allegations that the physician made no attempts to diagnose his head injury, provide treatment other than Tylenol, or order a MRI or CT scan were insufficient to state a claim upon which relief could be granted under the Eighth Amendment); Shields v. Illinois Dept. of Corrections, 746 F.3d

47

782, 797 (7th Cir. 2014)(finding that approval of a treatment recommendation of physical therapy regarding a pectoralis tear in plaintiff's shoulder was not deliberately indifferent). To the extent Plaintiff claims than another doctor's treatment plan was better than Defendants Edwards and Vest's treatment plan, this does not state a constitutional violation. See Lewis v. Proctor, 2010 WL 148383, * 3 (N.D.W.Va. Jan. 12, 2010)(an inmate's belief that one doctor's treatment plan was better than another's does not state a constitutional violation); Oglesby v. Abbassi, 2013 WL 4759249, * 7, n. 12 (E.D.Va. Sep. 4, 2013)("certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor"). Accordingly, the undersigned finds that Defendants Edwards and Vest did not act with deliberate indifference in providing testing and treatment for Plaintiff's shoulder injury. The Court, therefore, finds that Defendants Edwards and Vest's "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" should be granted.

Based upon the foregoing, the undersigned finds it unnecessary to consider the other reasons which the Defendants have submitted for dismissal regarding Plaintiff's claims.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 48) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Frank W. Volk. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days

(filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Volk and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: December 19, 2022.



Omar J. Aboulhosn
United States Magistrate Judge